IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:22-cv-1367

JACEY SILLER

 *Plaintiff*,

v.

CBRE, INC.

and

BRYAN SEMEL

 *Defendants*.

**COMPLAINT AND JURY DEMAND**

 Plaintiff Jacey Siller ("Plaintiff" or "Ms. Siller"), by and through undersigned counsel, hereby files this Complaint against Defendant CBRE, Inc. ("CBRE") and Defendant Bryan Semel ("Mr. Semel") (together, "Defendants"), and alleges as follows:

**NATURE OF ACTION**

 1. This action arises out of Mr. Semel's sexual harassment of Ms. Siller, CBRE's wrongful termination of Ms. Siller in retaliation for reporting Mr. Semel's sexual harassment, and Defendants' refusal to pay Ms. Siller amounts owed to her under respective agreements with each Defendant.

 2. Ms. Siller, a former CBRE employee, was severely and pervasively sexually harassed by Mr. Semel—her CBRE supervisor—after Ms. Siller ended a romantic relationship with him.

3. Among other things, Mr. Semel demanded Ms. Siller resume the romantic relationship or he would no longer adhere to a longstanding agreement to split CBRE commissions with Ms. Siller. Ms. Siller refused to resume the relationship, and as a result Mr. Semel and CBRE withheld commissions due to Ms. Siller.

4. Ms. Siller reported Mr. Semel's harassment, including the *quid pro quo*, to CBRE. In retaliation, CBRE terminated Ms. Siller at the very meeting in which she expected to learn the results of her internal complaint.

## PARTIES & JURISDICTION

5. Ms. Siller is a citizen of Florida.

6. CBRE is a company incorporated in Delaware with its principal place of business in Dallas, Texas.

7. Mr. Semel is a citizen of Colorado.

8. This Court has jurisdiction under 28 U.S.C. § 1331 because this action raises claims arising under the laws of the United States and under 28 U.S.C. § 1367 because all other claims are so related that they form part of the same case or controversy. This Court also has jurisdiction under 28 U.S.C. § 1332 because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and attorneys' fees.

9. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims in this action occurred in Colorado.

## FACTUAL BACKGROUND

10. Ms. Siller is a commercial real estate agent. She previously worked as a commercial real estate agent or leasing representative at Brookfield Properties in Los Angeles, California; Combined Properties in Beverly Hills, California; and the Comras Company in Miami Beach, Florida.

11. CBRE is a worldwide commercial real estate firm. CBRE has numerous offices in Colorado, California, and elsewhere in the United States. Upon information and belief, CBRE had over 500 employees at all relevant times.

12. On or around January 28, 2021, CBRE hired Ms. Siller as a real estate salesperson. Ms. Siller and CBRE signed a Broker-Salesperson Contract ("CBRE Contract") setting forth the terms and conditions of her employment at CBRE, with an effective start date of February 1, 2021.

13. The CBRE Contract's Section 11 states "Commissions shall be paid to Salesperson in accordance with the provisions of CBRE's Policies."

14. Real estate salespeople at CBRE are paid commissions on deals that close. CBRE receives the commission directly and then passes on portions of the commission to the real estate salespeople who worked on the deal, after taking the firm's cut.

15. CBRE Policy No. 10.12 states CBRE "shall pay" the salesperson's commission "as soon as reasonably possible after it has been earned . . ."

16. During her time as a real estate salesperson with CBRE, Ms. Siller served CBRE clients in southern California and Aspen, Colorado. Ms. Siller split her time between home offices in California and Aspen.

17. Mr. Semel was also a real estate salesperson employed by CBRE. He was based in Aspen, and until Ms. Siller joined CBRE, he was the only CBRE real estate salesperson focused on serving clients in Aspen. CBRE did not have a physical office in Aspen, and Mr. Semel worked from a home office.

18. Upon information and belief, Mr. Semel has been a commercial real estate agent in Aspen since approximately 2015, and he joined CBRE in January 2020.

19. Mr. Semel recruited Ms. Siller to join CBRE and, upon information and belief, was responsible for Ms. Siller being hired by CBRE. Mr. Semel told Ms. Siller that she worked for him, and, as the more senior real estate salesperson at CBRE and in Aspen, he supervised Ms. Siller.

20. Mr. Semel exercised control over payment of commissions to Ms. Siller and managed and monitored her day-to-day work activities.

### Commission-Split Agreement

21. It is common both in the commercial real estate industry and at CBRE for real estate salespeople to work together on deals and agree to split the salesperson's portion of the commission (that is, the portion of the commission remaining after CBRE takes its cut).

22. In or around February 2021, Mr. Semel and Ms. Siller agreed to split all their CBRE commissions 50-50 ("Commission-Split Agreement"). For every deal that either Mr. Semel or Ms. Siller closed, each was to receive 50% of the salesperson's portion of the commission.

23. Pursuant to the Commission-Split Agreement, Mr. Semel caused invoices to be submitted to CBRE specifying the 50-50 commission split for each deal that closed.

24. CBRE Policy No. 10.12 states "Agreements between Eligible Professionals to allocate the Gross Commissions among Eligible Professional will generally be honored by" CBRE.

25. Mr. Semel and Ms. Siller are Eligible Professionals under CBRE Policy No. 10.12.

26. In accordance with that policy, CBRE initially honored the Commission-Split Agreement between Mr. Semel and Ms. Siller by splitting their commissions 50-50.

## Mr. Semel's Sexual Harassment of Ms. Siller

27. Ms. Siller and Mr. Semel also had a romantic relationship. In or around early October 2021, Ms. Siller ended the relationship.

28. After Ms. Siller ended the relationship, Mr. Semel began an unchecked campaign of sexual harassment against Ms. Siller. Mr. Semel's sexual harassment included, among other things:

   a. Mr. Semel yelling and screaming insults at Ms. Siller on a near-daily basis;

   b. Mr. Semel stalking Ms. Siller at her home and her gym;

   c. Mr. Semel disparaging and threatening to disparage Ms. Siller's work as a real estate salesperson to her friends, clients, and her former employer;

   d. As detailed further below, Mr. Semel undermining Ms. Siller's ability to perform her work; and,

   e. As detailed further below, Mr. Semel demanding a *quid pro quo*, in which Ms. Siller would have to resume a romantic relationship or Mr. Semel would no longer honor the Commission-Split Agreement.

29. Ms. Siller often told Mr. Semel to stop harassing her. On one occasion when Ms. Siller told Mr. Semel, via text message, that he was harassing her, Mr. Semel sent Ms. Siller a text message saying she needed to "Get some tougher skin." He then threatened to "tell Comras"—Ms. Siller's former employer—"what I think."

30. Mr. Semel made it impossible for Ms. Siller to do her job. He oscillated between refusing to speak with her on some days, and aggressively harassing her on other days when she attempted to speak with him about work.

   a. For instance, when Ms. Siller tried to discuss work with Mr. Semel, he would often accuse her of not caring about him, tell her that she was "nothing" without him, or try to convince her to renew the relationship. When Ms. Siller told Mr. Semel via text message that he should "only call me about business," he responded, "I'm never calling you again."

   b. Mr. Semel often refused to take work calls from Ms. Siller or speak with Ms. Siller about clients. For instance, on one occasion, Ms. Siller called Mr. Semel three times to discuss an issue with a client. When she then texted him about it, Mr. Semel responded, "I don't want to talk to you anymore."

   c. Other times, Mr. Semel insisted on speaking about work via video chat or in person, rather than by telephone or email. When Ms. Siller told him, via text message, that video chat was not necessary for work calls, he responded, "Sorry I want to see you."

31. Mr. Semel also refused to provide Ms. Siller information she needed to do her job, and excluded her from client meetings and communications.

  a. For instance, when Ms. Siller asked Mr. Semel for the address of a property she was meant to visit, he responded, via text message, "Fuck that." Ms. Siller again asked, "What is the address of the building," and he responded, "No."

  b. When Ms. Siller told Mr. Semel, via text message, that he was "keeping me [from] doing my job" by not "giv[ing] me the address to the off market property when I've asked for it," he responded by saying, among other things, "So what." She later sent a text message asking, "Why I am not being given [the address]? Is it [because] you are trying to spite me?" He replied, "I can care less."

  c. On other occasions, Mr. Semel excluded Ms. Siller from client meetings and communications of the type she regularly participated in while she and Mr. Semel had a romantic relationship. When Ms. Siller sent a text message to Mr. Semel saying, "You can't choose to cut me out of whatever you feel like," Mr. Semel responded by saying, among other things, "I don't give a shit."

32. Mr. Semel also told Ms. Siller on numerous occasions, both orally and via text message, that she had to be in a romantic relationship with him in order to continue their business relationship. He said he would only continue to adhere to their Commission-Split Agreement, including for deals they had already been working on together for months, if she resumed a romantic relationship with him.

  a. For instance, in a text message to Ms. Siller, Mr. Semel said "I shouldn't feel like you're going to break up with me after I bring all this business in." Ms. Siller responded, "We're splitting the deals on the table. Has nothing to do with our relationship. . . . I'm not going to be threatened when we entered into a work

7

    partnership 50/50." He responded by saying, among other things, "To me it does. . . . I don't need a partner I wanted both or nothing." Ms. Siller replied, "I wouldn't agree to a work partnership dependent on a relationship."

b. Mr. Semel also sent a text message to Ms. Siller saying, among other things, "[w]e are all the way together or nothing." Ms. Siller replied, "No. We agreed 50-50 on [d]eals. How do you think holding a relationship over my head for commissions works?!"

c. On another occasion, in an attempt to convince Mr. Semel to honor the Commission-Split Agreement, Ms. Siller sent Mr. Semel a text message describing the work she put into the deals: "I speak to you about deals every day. I've helped navigate the deals with you every day. For the past year." Mr. Semel responded, "You lost the privilege of new avenues when you broke up with me . . . . I don't care if you are out on the street."

d. When Mr. Semel refused to pay commissions owed to Ms. Siller, she sent Mr. Semel a text message saying, "I deserve my commission. To finish these deals. Not be yelled at." Mr. Semel responded, "This is about you threatening me about breaking up with me."

e. Despite refusing to honor the Commission-Split Agreement, Mr. Semel did not dispute there was an agreement. For instance, when Ms. Siller sent him a text message saying "I'm just as deserving of commissions as you. We are supposed to be a team," Mr. Semel responded by saying, among other things, "You deserve it because I made a deal with you."

33. Ms. Siller rejected Mr. Semel's *quid pro quo* and refused to resume the romantic relationship. Mr. Semel then began to direct his assistant, Ms. Kimberly Duong, to submit invoices to CBRE stating the entire commission for the deal was to go to Mr. Semel. Upon information and belief, Duong raised concerns about this to her supervisor, but CBRE took no action.

34. CBRE did what Mr. Semel asked and paid commissions just to him, even though Ms. Siller was owed the commissions pursuant to her CBRE Contract, CBRE Policy 10.12, and her Commission-Split Agreement with Mr. Semel, and even though she had worked for months on the deals with the expectation of receiving commissions.

**Ms. Siller Reports Mr. Semel's Sexual Harassment to CBRE**

35. In or around late November 2021, Ms. Siller notified the Managing Director of CBRE's Denver office, Mr. D Bergin, of Mr. Semel's misconduct, including Mr. Semel's and CBRE's failure to pay commissions owed to her.

36. Mr. Bergin told Ms. Siller that it sounded like sexual harassment, and he asked her if she wanted to pursue an internal sexual harassment complaint against Mr. Semel. Ms. Siller said she did want to pursue an internal sexual harassment complaint.

37. In or around December 2021, Mr. Donnie Wynn, a Senior Investigator in CBRE's Ethics and Compliance group, contacted Ms. Siller. Ms. Siller told Mr. Wynn about Mr. Semel's misconduct, including that he was sexually harassing her and that he and CBRE refused to pay commissions owed to her. Mr. Wynn told Ms. Siller that he was going to investigate.

38. Throughout December 2021 and January 2022, Ms. Siller provided detailed information to Mr. Wynn regarding Mr. Semel's misconduct, including but not limited to text

9

messages between Mr. Semel and Ms. Siller in which Mr. Semel made clear Ms. Siller had to be in a relationship with him to receive a 50-50 commission split.

39. Upon information and belief, Mr. Wynn interviewed Mr. Semel or otherwise alerted him to the investigation without notifying Ms. Siller.

40. Upon information and belief, shortly after Mr. Semel was alerted to the investigation, Mr. Semel's attorney threatened to sue Ms. Siller, and Mr. Semel intensified his stalking, including by appearing unannounced at Ms. Siller's apartment building, though she was not present at the time.

## CBRE Retaliates Against Ms. Siller

41. In or around late January 2022, Mr. Wynn told Ms. Siller the investigation had concluded and that she would soon hear from CBRE's management.

42. Ms. Siller was then invited to a Zoom meeting on or around February 1, 2022, with Mr. Bergin and other management and human resources personnel from CBRE. Ms. Siller understood the purpose of the meeting was to announce the results of the sexual harassment investigation.

43. To her surprise, CBRE terminated Ms. Siller during the meeting, effective immediately.

44. CBRE's representatives claimed in the meeting that they were terminating Ms. Siller because she did not have a real estate license in Colorado. This was pretextual:

   a. CBRE terminated Ms. Siller out of the blue right after the conclusion of the sexual harassment investigation;

    b. Ms. Siller had a real estate license in California, where she practiced before joining CBRE, and where she continued to serve clients while at CBRE;

    c. CBRE knew from the outset of Ms. Siller's employment that she was only licensed in California, not Colorado;

    d. CBRE previously paid Ms. Siller commissions for deals in Colorado without issue;

    e. Ms. Siller had applied for a license in Colorado and paid the application fee on June 23, 2021, but had yet to receive it.  Upon information and belief, there was a delay in processing the application due to the COVID-19 pandemic; and

    f. Upon information and belief, salespeople at CBRE often served clients in states in which they were not licensed, with CBRE's knowledge, so long as one other salesperson working on the deal was licensed in the relevant state.  Upon information and belief, Mr. Semel was licensed in Colorado at all relevant times.

45. In fact, CBRE fired Ms. Siller in retaliation for reporting Mr. Semel's sexual harassment.

46. CBRE did not inform Ms. Siller at the meeting—or at any other point—about the findings of the sexual harassment investigation.

47. To date, Ms. Siller has not received the commissions she is owed by CBRE and Mr. Semel.   The total commissions owed to her by CBRE and Mr. Semel exceed $500,000.

48. Ms. Siller filed a charge of discrimination against CBRE with the Equal Employment Opportunity Commission ("EEOC"), cross-filed with the Colorado Civil Rights Division, on April 11, 2022, and received Notice of Right to Sue from EEOC on May 17, 2022.

## COUNT I
### SEXUAL HARASSMENT – HOSTILE WORK ENVIRONMENT
### 42 U.S.C. § 2000e–2 *et seq.*
### (Against CBRE, Inc.)

49. Plaintiff realleges and incorporates the allegations set forth in the above paragraphs in this Complaint as though fully set forth herein.

50. Starting on or about October 1, 2021, Mr. Semel subjected Ms. Siller, a member of a protected group, to unwelcome sexual harassment on account of her sex.

51. Mr. Semel's harassment was severe and pervasive, and Ms. Siller perceived it to be so.

52. Mr. Semel's harassment interfered with her work performance, altered the terms, conditions, and privileges of her work, and created an abusive working environment.

53. Mr. Semel was Ms. Siller's supervisor, and his sexual harassment resulted in tangible employment actions.

54. Mr. Semel's misconduct was within the scope of his employment with CBRE.

55. CBRE was aware of Mr. Semel's sexual harassment and failed to take reasonably prompt and corrective action, and CBRE was negligent in failing to address Mr. Semel's sexual harassment.

56. As a direct and proximate cause of Mr. Semel's sexual harassment, Ms. Siller suffered monetary damages, loss of income, and emotional anguish and distress, including embarrassment, resentment, stress, humiliation, and difficulty performing work.

57. CBRE acted with malice and reckless indifference in the face of a perceived risk that its action would violate federal law.

**COUNT II**
**SEXUAL HARASSMENT – *QUID PRO QUO***
**42 U.S.C. § 2000e–2 *et seq*.**
**(Against CBRE, Inc.)**

58.     Plaintiff realleges and incorporates the allegations set forth in the above paragraphs in this Complaint as though fully set forth herein.

59.     Starting on or about October 1, 2021, Mr. Semel engaged in *quid pro quo* sexual harassment by conditioning payment of CBRE commissions on Ms. Siller's submission to his demand that she resume a romantic relationship with him.

60.     Mr. Semel's sexual advances were unwelcome, and Ms. Siller's acceptance or rejection of the *quid pro quo* constituted an express and implied condition of her receiving CBRE commissions.

61.     Ms. Siller's refusal to accept Mr. Semel's advances affected a tangible aspect of her employment, namely, Mr. Semel's denial of payment of CBRE commissions, and Mr. Semel's interference with Ms. Siller's work.

62.     Mr. Semel was Ms. Siller's supervisor, and his sexual harassment resulted in tangible employment actions.

63.     Mr. Semel's misconduct was within the scope of his employment with CBRE.

64.     CBRE was aware of Mr. Semel's sexual harassment and failed to take reasonably prompt and corrective action, and CBRE was negligent in failing to address Mr. Semel's sexual harassment.

65.     As a direct and proximate cause of Mr. Semel's sexual harassment, Ms. Siller suffered monetary damages, loss of income, and emotional anguish and distress, including embarrassment, resentment, stress, humiliation, and difficulty performing work.

66. CBRE acted with malice and reckless indifference in the face of a perceived risk that its action would violate federal law.

## COUNT III
## RETALIATION
## 42 U.S.C. § 2000e–3 *et seq*.
## (Against CBRE, Inc.)

67. Plaintiff realleges and incorporates the allegations set forth in the above paragraphs in this Complaint as though fully set forth herein.

68. Ms. Siller engaged in a protected activity in opposition to an unlawful employment practice by reporting Mr. Semel's sexual harassment to CBRE representatives from November 2021 to January 2022.

69. CBRE terminated Ms. Siller's employment at CBRE in retaliation for her protected activity.

70. CBRE's termination of Ms. Siller would dissuade a reasonable employee from opposing unlawful employment practices.

71. As a direct and proximate cause of CBRE's wrongful termination, Ms. Siller suffered monetary damages, loss of income, and emotional anguish and distress, including embarrassment, resentment, stress, humiliation, and difficulty performing work.

72. CBRE acted with malice and reckless indifference in the face of a perceived risk that its action would violate federal law.

## COUNT IV
## BREACH OF CONTRACT
## (Against CBRE, Inc.)

73. Plaintiff realleges and incorporates the allegations set forth in the above paragraphs in this Complaint as though fully set forth herein.

74. The CBRE Contract between CBRE and Ms. Siller is an express, written contract, which incorporated CBRE Policy No. 10.12 as to payment of commissions.

75. Ms. Siller performed her obligations under the CBRE Contract.

76. CBRE breached the terms of the CBRE Contract by failing to pay Ms. Siller commissions due to her.

77. CBRE's breach of the CBRE Contract caused Ms. Siller to suffer monetary damages.

## COUNT V
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against CBRE, Inc.)

78. Plaintiff realleges and incorporates the allegations set forth in the above paragraphs in this Complaint as though fully set forth herein.

79. The CBRE Contract between CBRE and Ms. Siller is an express, written contract, which incorporated CBRE Policy No. 10.12 as to payment of commissions.

80. Ms. Siller performed her obligations under the CBRE Contract.

81. CBRE acted arbitrarily and unreasonably in breach of the implied covenant of good faith and fair dealing by failing to honor the Commission-Split Agreement between Ms. Siller and Mr. Semel, thus depriving Ms. Siller the benefit of the CBRE Contract.

82. CBRE's breach caused Ms. Siller to suffer monetary damages.

## COUNT VI
## BREACH OF CONTRACT
### (Against Bryan Semel)

83. Plaintiff realleges and incorporates the allegations set forth in the above paragraphs in this Complaint as though fully set forth herein.

84. The Commission-Split Agreement is an express and implied-in-fact contract.

85. Ms. Siller performed her obligations under the Commission-Split Agreement.

86. Mr. Semel breached the terms of the Commission-Split Agreement by failing to split commissions 50-50 with Ms. Siller.

87. Mr. Semel's breach of the Commission-Split Agreement caused Ms. Siller to suffer monetary damages.

**COUNT VII**
**UNJUST ENRICHMENT**
**(Against CBRE, Inc. and Bryan Semel)**

88. Plaintiff realleges and incorporates the allegations set forth in the above paragraphs in this Complaint as though fully set forth herein.

89. Ms. Siller worked for months on deals with the expectation that she would receive a 50-50 split of the salesperson's portion of the commissions.

90. CBRE and Mr. Semel received commissions on those deals.

91. Despite her months of work, Ms. Siller did not receive commissions for those deals after she ended her romantic relationship with Semel.

92. It is unjust for CBRE and Semel to retain the full commissions received on deals Ms. Siller worked on when she has not been paid anything on those deals.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court:

A. Enter judgments against Defendants in favor of Plaintiff;

B. Award Plaintiff damages in amount to be proven at trial for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment;

C. Award Plaintiff compensatory and punitive damages pursuant to 42 U.S.C. § 1981a, in an amount to be proven at trial;

D. Award Plaintiff back pay and front pay pursuant to 42 U.S. Code § 2000e–5, in an amount to be proven at trial;

E. Award Plaintiff attorneys' fees and costs pursuant to 42 U.S. Code § 2000e–5;

F. Award Plaintiff pre- and post-judgment interest; and,

G. Award Plaintiff other such relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

June 1, 2022                                     Respectfully submitted,


                                                 */s/ Branden Lewiston*
                                                 Branden Lewiston
                                                 AEGIS LAW GROUP LLP
                                                 801 Pennsylvania Ave. N.W., Suite 740
                                                 Washington, DC 20004
                                                 Telephone: 202-301-2318
                                                 Fax: 202-735-5071
                                                 E-mail: blewiston@aegislawgroup.com

                                                 *Attorney for Plaintiff Jacey Siller*
                                                 11 Island Ave. Apt. 1605
                                                 Miami Beach, FL 33139